IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 1:13-CR-286-01-GBL |
| | ) | |
| v. | ) | Honorable Gerald Bruce Lee |
| | ) | |
| QUINTAVIS DEONTE DUMAS, | ) | Sentencing: December 6, 2013 |
| a.k.a. "Tay," | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States has reviewed the presentence report and has no material objections or corrections. The government agrees that the advisory Guideline range has been accurately calculated as 360 months of imprisonment to life imprisonment. In light of the substantial harm suffered by the teenage victims, the government recommends a sentence of 360 months of imprisonment. The government does not request a fine, but will ask this Court to enter a Restitution Order in the amount of $17,572.47.

**I.      Applicable Sentencing Law**

The Sentencing Guidelines promulgated by the Sentencing Commission are advisory, although sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 264, 125 S. Ct. 738, 767 (2005). "The Guidelines require the district judge to give due consideration to the relevant sentencing range . . . ." *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011) (plurality opinion). In "the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S.

1

85, 109, 128 S. Ct. 558, 574 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350, 127 S. Ct. 2456, 2465 (2007)). Accordingly, a "district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

The "Guidelines should be the starting point and the initial benchmark," keeping in mind that a sentencing court "may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in § 3553(a), subject to appellate review for 'reasonableness.'" *Pepper v. United States*, 131 S. Ct. 1229, 1241 (2011). Although "the Guidelines are advisory rather than mandatory, they are . . . the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall v. United States*, 552 U.S. 38, 46, 128 S. Ct. 586, 594 (2007). A sentencing court, therefore, "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a) states that the court should consider the nature and circumstances of the offense and characteristics of the defendant. In addition, the court must consider other factors, including the need for the sentence "to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense; [and] to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(A) & (B). The Court should also consider the need to avoid

2

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6).

## II. Background

The evidence presented at trial showed that Dumas was a member of an interstate enterprise to prostitute girls and women wherever paying customers could be found. Dumas was the cousin of the leaders of the organization, Edwin Barcus and Joshua Dumas, and Joshua Dumas and Quintavis Dumas were "like brothers." Although the scheme originated in Atlanta, Georgia, Dumas and the other defendants traveled extensively to avoid detection by law enforcement. Dumas assisted in the prostitution of teenage girls in at least six states: Virginia, South Carolina, North Carolina, Georgia, Florida, and Tennessee. Barcus and Joshua Dumas prostituted at least seven underage girls, and Dumas assisted them in doing so.[1]

In addition to requiring these girls to submit to sex acts with strange men, day after day, the leader of the enterprise, Edwin Barcus, also helped himself to sex with these girls whenever he desired. The girls were kept vulnerable and intoxicated by plying them with liquor and drugs, including marijuana and "Molly" (the chemical composition of which is similar to "ecstasy"). Indeed, at trial, the jury heard that Dumas admitted that one of his roles was to obtain the marijuana that was given to the victims. When the drugs proved insufficient to keep some girls in line, Dumas was well aware that Barcus resorted to force, particularly with woman who testified at trial

---

[1] Dumas argues that this Court may not consider evidence that pertains to counts of the Indictment of which Dumas was convicted or on which the jury could not reach a verdict. But the law does not support such an argument. *See* 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence"); *United States v. Watts*, 519 U.S. 148, 157 (1997) ("a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence").

3

and described suffering repeated beatings at Barcus's hands. Dumas also knew that Barcus and Joshua Dumas required the girls and women they prostituted to give them *every penny* they earned, and the testimony at trial was that Dumas sometimes helped collect the money.

Even by the low standards of pimps, Barcus was particularly depraved, which Dumas's attorney conceded at trial. Dumas knew about Barcus's depravity, yet continued to assist him in running his prostitution business. For example, when Barcus encountered prostitutes who refused to work for him, he would steal their money. At trial, the jury heard about one such episode of theft that occurred in May 2012, yet Dumas continued to work with Barcus.[2] At trial, the jury also heard how Barcus was training his underage relative to be a pimp, and used this juvenile to act as a lookout and to run errands and monitor the girls whom Barcus was prostituting. Because he was a juvenile, Barcus also instructed this boy to pose as the boyfriend of underage girls to mislead the police. Dumas was aware of all of this and fully participated in the prostitution venture despite this knowledge.

Despite knowing the depth of Barcus's depravity, the evidence at trial showed that Dumas continued to assist Barcus and Joshua Dumas in prostituting underage girls by: (1) obtaining drugs that were given to the girls to numb their sensibilities; (2) renting cars that were used to transported victims interstate; (3) advising Edwin Barcus on the operation of his business; (4)

---

[2] Many pimps beat prostitutes who do not meet the monetary quota set by the pimps. *See United States v. Pipkins*, 378 F.3d 1281, 1285-86 (11th Cir. 2004) (describing many of the rules and characteristics of the "pimping subculture"), *vacated on Booker grounds,* 544 U.S. 902 (2005), *opinion reinstated*, 412 F.3d 1251 (11th Cir.), *cert. denied*, 546 U.S. 994 (2005). *United States v. Maes*, 2009 WL 5064621, at *1 (M.D. Pa. Dec. 23, 2009) ("Women were beaten if they failed to make their financial quota of earnings for the night . . . ."). By helping Barcus, including helping him flee after Barcus stole money, the defendant knew quite well that many of these women would later be beaten for failing to meet their pimps' quota. The evidence at trial showed that after one such theft, Dumas drove the getaway car and instructed the girls who were being prostituted to flee the hotel where they had been staying.

4

acting as the "muscle" to intimidate girls and rival pimps and protect the cash that was earned from prostituting underage girls; (5) carrying a pistol to be used whenever it was needed; (6) allowing the computer he shared with Koya Rooke to be used to post prostitution advertisements on Backpage.com; and (7) renting hotels rooms that were used to prostitute the underage victims.

### III. The Sentence Suggested by the Sentencing Guidelines is Appropriate

In this case, 360 months of imprisonment, which is the minimum sentence suggested by the Sentencing Guidelines, is appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).

#### A. Nature and Circumstances of the Offense

Dumas's sentence should reflect the seriousness of the child sex trafficking business that he willfully joined and assisted, including the fact that Dumas has helped ruin the lives of a substantial number of vulnerable victims. The combination of nine aggravating factors discussed below calls for the imposition of a sentence of 360 months of imprisonment.

##### 1. Dumas's Level of Responsibility

The defendant was a trusted member of the child prostitution business; indeed, he was close friends with his cousins Edwin Barcus and Joshua Dumas. He told investigators that he and Joshua Dumas were "like brothers." That level of trust was important, because Barcus and Joshua Dumas needed someone they could trust. The prostitution business needed drugs to keep the girls numb, it needed "muscle" to protect the profits and intimidate girls and rival pimps, and it needed transportation and hotels in which girls could be prostituted. Dumas provided all of these things along with a willingness not to report this criminal conduct to the police. Although he did not have a leadership role in the business, Dumas was instrumental to the prostitution venture. For example, he was the one who typically carried a pistol and he provided advice to Barcus on how to operate his venture. Therefore, Dumas is more culpable than someone who was merely

5

following orders. *See United States v. Tejada-Beltran*, 50 F.3d 105, 111 (1st Cir. 1995) (noting the importance of increasing the punishment of those who exercised more responsibility for the operation of a criminal enterprise).

### 2. Protracted Duration of Dumas's Criminal Conduct

The extensive duration of Dumas's criminal conduct also suggests that a sentence within the range suggested by the Guidelines is appropriate. *United States v. Garner*, 489 F. App'x 721, 722 (4th Cir. 2012) (noting that the extended duration of criminal conduct warrants increased punishment); *United States v. Sutton*, 431 F. App'x 486, 487 (7th Cir. 2011) (same). Dumas was not involved with the prostitution of minors for only one week or even one month. He was involved for at least six months, and would have remained in the business longer but for the Fairfax County Police discovering his crimes.

### 3. Exploitation of Vulnerable Minors

Another factor militating in favor of a sentence of 360 months of imprisonment is the fact that the victims in this case were all minors when Dumas and his co-conspirators exploited them.[3] The victims were unusually vulnerable due to their youth, and Dumas knew this. Normally a defendant's offense level would be enhanced for targeting "vulnerable victims," but in setting the offense level for the Sex Trafficking of a Child offense, the Guidelines took the vulnerability of the young victims into account. Thus, the "vulnerable victim" enhancement was essentially built into Dumas's offense level, and only by sentencing Dumas according to the sentencing range

---

[3] This is not to deny or in any way minimize the pain of the adults who also suffered harm in this case.

suggested by offense level 41 can this Court fully take into account the vulnerability of the victims.[4]

For a number of reasons, the law punishes crimes against minors more severely than crimes against adults. As this Court saw firsthand when the various victims testified, teenagers are more vulnerable than adults; they are more easily manipulated and coerced because they lack the intelligence and judgment of adults; teenagers are more easily frightened and are less likely to report crimes; and crimes against teenagers are more likely to have a lasting and damaging impact on the young minds and bodies of the victims. *See United States v. Hughes*, 632 F.3d 956, 962 (6th Cir. 2011) (noting the special vulnerabilities of children). Lining one's pockets by repeatedly prostituting teenagers is a heinous crime with far-reaching and permanent consequences for the victims. Accordingly, such crimes should also have some significant consequences for the defendants who perpetrate them.

This Court should also remember that beyond the mere exploitation of some of society's most vulnerable victims, sexual crimes involving minors inherently pose a substantial risk of physical force being used (not to mention serious injury resulting from that use of force). *United States v. Vann*, 660 F.3d 771, 772 (4th Cir. 2011) (en banc); *Chery v. Ashcroft*, 347 F.3d 404, 408–09 (2d Cir. 2003). Defendants like Dumas, who assisted Barcus and Joshua Dumas in committing such crimes show their disregard for society's laws, their reckless disregard for the

---

[4] "The 'vulnerable victim' sentencing enhancement is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal. Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them." *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999).

7

welfare of minors, and the probability that violence will be used to keep such minors "in line." This further suggests that a sentence of 360 months of imprisonment is appropriate.

### 4. Administration of Drugs to Underage Girls

Dumas's sentence also should reflect the fact that drugs were used to keep some of the victims intoxicated and compliant, and that the evidence at trial showed the Dumas played an important role in this. Through the use of narcotics on the victims, Barcus and Joshua Dumas substantially impaired the ability of these minor girls to appraise and control their conduct. Dumas's sentence should reflect this further level of depravity and the use of drugs to overcome resistance to prostitution, not to mention Dumas's lack of concern for the damage that drugs do to young minds and bodies. It should also reflect the fact that he himself admitted to law enforcement agents that he was responsible for acquiring the marijuana that was used to keep the girls intoxicated and compliant.

### 5. Broad Geographic Scope of the Venture

Another factor that suggests the appropriateness of a Guideline sentence is the geographic scope of the conspiratorial activities. The venture was not simply a small-time, neighborhood operation by part-time pimps. It was a well-managed, financially-lucrative, interstate enterprise that systematically relocated to maximize profits and evade detection by the police. It operated in at least six states (Virginia, North Carolina, South Carolina, Georgia, Florida, and Tennessee) and many different cities in the various states. The breadth and the scope of the enterprise itself suggests that a strong sentence is necessary in this case.

### 6. Use of a Minor to Assist in the Commission of Crimes

Beyond pimping and drugging multiple underage girls, Dumas and Barcus used an underage relative to assist in the scheme. Under Section 3B1.4, this resulted in an additional

8

two-level increase to his offense level. Among other things, this teenager was used as a lookout for law enforcement, to monitor the minor victims, and instructed the teenager to pose as the boyfriend of a teenage victim if the police ever inquired.

This teenage boy saw first-hand how prostituting teenage girls worked, and had a front-row seat for the sexual exploitation of minors. Indeed, this juvenile sometimes was stationed in the closets of hotel rooms when the minor victims were submitting to sex acts with customers. The government recovered several photographs of this juvenile posing with wads of cash that the victims had earned from prostitution. When interviewed by the police, this boy related that his only ambition in life was to "get rich." Whether the boy understood it or not, Barcus and the others were training him to become a pimp. Undoubtedly the boy concluded that teenage girls are simply chattel to be used to make money,[5] and that being a pimp is a relatively easy way to "get rich." Dumas knew about this and regularly transported this boy and rented the hotel rooms in which he stayed. This greatly increased the probability that this boy will pursue a career as a pimp. For leading this youth astray and for pushing him into criminal activity, Dumas also deserves increased punishment.

### 7. Robberies of Prostitutes

Dumas further warrants increased punishment because he continued to help Barcus operate his prostitution business despite knowing that Barcus robbed prostitutes who refused to work for him. Because women and girls were the lifeblood of Barcus's operation, Barcus was constantly seeking to find new victims. When some of these women and girls refused to submit to Barcus,

---

[5] The fact that a number of the girls were "branded" with tattoos further demonstrated that the girls were viewed as property and that Barcus hoped to exercise long-term control over their bodies. The tattoos also served as a psychological chain that tied the girls to the enterprise. They are a lasting reminder to these girls of what the defendant and his co-conspirators did to them.

Barcus and his co-conspirators would steal their money from them. Many pimps impose a quota on their prostitutes that they enforce through beatings. *United States v. Pipkins*, 378 F.3d 1281, 1285-86 (11th Cir. 2004). Dumas knew that Barcus's thefts from these prostitutes would cause many of these women to be doomed to additional beatings at the hands of their pimps. Yet when Barcus robbed one such prostitute in Savannah, Georgia, Dumas drove the getaway car and received at least a portion of the proceeds.

### 8. Use of a Firearm

Dumas's carrying and use of a firearm to further the prostitution business also warrants additional punishment. At trial, the jury heard that during and in furtherance of the child prostitution business, Dumas and his co-conspirators carried and brandished two pistols. The pistols were used to protect the ill-gotten profits and to prevent competing pimps from "stealing" the girls who were being prostituted. In addition, when Dumas, Koya Rooke, and Edwin Barcus traveled to Tennessee to "steal" one of the girls from a competing pimp, Dumas carried the pistol in his pocket, and kept his hand in his pocket while Barcus was addressing the competitor pimp. The evidence at trial showed that some of the girls and women whom Barcus prostituted knew about the pistols, and this knowledge undoubtedly encouraged them to obey Barcus and comply with his orders to prostitute.

As the Supreme Court has stated, a "gun is an article that is typically and characteristically dangerous; the use for which it is manufactured and sold is a dangerous one, and the law reasonably may presume that such an article is always dangerous even though it may not be armed at a particular time or place. In addition, the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue." *McLaughlin v. United States*, 476 U.S. 16, 17-18, 106 S. Ct. 1677, 1678 (1986). The use of firearms increased

Quintavis Duma's power and his ability to coerce others to do his will. These weapons also increased the danger that Dumas and Barcus posed to others, and increased the probability that someone would be killed or seriously injured. Because Dumas procured and carried the firearms, he deserves increased punishment.

### 9. The Use of Violence and Beatings of Victims

Dumas also knew that Barcus sometimes used force to keep those whom he prostituted in line. At trial, the jury heard from one such woman and how she was the mother of an infant child in need of financial support. One day, this woman hid a portion of the money she earned from prostitution (so that she could send it to the person who was caring for her infant), which was contrary to Barcus's rule that all of the money earned belonged to him. When Barcus found out that she had retained some of "his" money, he severely beat her simply for seeking to provide for her child *with money she herself had earned*. She had suffered beatings from Barcus before, (and Dumas knew of these beatings) but this time Barcus fractured her nose and blackened her eyes.[6] Although she begged for medical attention, Barcus refused to afford her any medical assistance, nor did Dumas.

This callous indifference to the pain of others was typical of Dumas, Barcus and the others. For example, the jury also heard that Barcus paid for one of the underage victims to be transported via Greyhound bus from Atlanta to Virginia. When this girl objected that she did not want to be transported to Virginia to prostitute, Joshua Dumas told this girl that she was his "bitch"[7] and that

---

[6] In the language of pimping, Barcus was a "gorilla pimp," meaning a pimp who used violence and threats of violence to keep control of the women and girls he prostituted. *See Pipkins*, 378 F.3d at 1285. Barcus even bragged to one of the victims that he was a gorilla pimp, so it is not as though Dumas was unaware of Barcus's violent nature.

[7] To further dehumanize them, pimps frequently refer to girls and women that they

11

"under the rules of the game,"[10] she had to go to Virginia. Out of fear, she complied, and when she arrived in Richmond, Virginia, she was driven by Dumas to the hotel in Herndon where she was prostituted. The government has a particular duty to ensure that society is protected from violence and threats of violence. Dumas's sentence should reflect the role he played in the use of violence and threats of violence and his repeated willingness to turn a blind eye to the violence.

### B. History and Characteristics of the Defendant

Dumas's history and characteristics offer further reasons for sentencing him to 360 months of imprisonment. Dumas was a close friend and relative of Edwin Barcus and Joshua Dumas, and thus Dumas had intimate knowledge about the victims being exploited. Despite having detailed knowledge of the operation and its various crimes, Dumas embraced the pimp lifestyle because it involved little effort, paid handsomely, and involved frequent travel and stays at nice hotels.

### C. Need of the Sentence to Reflect the Serious of the Offense, to Promote Respect for the Law, and to Provide Just Punishment

Imposing a sentence according to the range suggested by the Guidelines would reflect the seriousness of Dumas's offense, would promote respect for the law, and would provide just punishment for the offenses committed by Dumas. As demonstrated above, Dumas's conduct was egregious and his crime was a serious one. In light of the substantial harm caused by the prostitution business of which Dumas was a member, Dumas warrants substantial punishment. Only a substantial sentence will promote proper respect for the law and provide a just punishment to Dumas. Some people continue to label prostitution a "victimless" crime. Nothing could be

---

prostitute as "bitches," rather than using their given name.

[10] Pimps generally refer to their pimping activities as "the game." *Pipkins*, 378 F.3d at 1285.

further from the truth, as the many victims in this case demonstrate. A substantial sentence will go a long way to promoting respect for laws that Congress enacted to protect teenage victims of sex trafficking.

### D. The Need of the Sentence Imposed to Afford Adequate Deterrence and Protect the Public from further crimes of the Defendant

There is a great need for Dumas's sentence to deter others who are prostituting teenagers or who might consider doing so. *United States v. Flores-Machicote*, 706 F.3d 16, 22 (1st Cir. 2013) ("Deterrence is widely recognized as an important factor in the sentencing calculus."); *United States v. Miller*, 484 F.3d 964, 967-68 (8th Cir. 2007) ("general deterrence . . . is one of the key purposes of sentencing . . . ."); *United States v. Jackson*, 835 F.2d 1195, 1199 (7th Cir. 1987) (Posner, J., concurring) ("deterrence is the surest ground for punishment . . . since incapacitation may, by removing one offender from the pool of offenders, simply make a career in crime more attractive to someone else, who is balanced on the razor's edge between criminal and legitimate activity and who now faces reduced competition in the crime 'market.'"). Unfortunately, as this case has shown, the prostitution of minors can be financially enriching. In addition, "pimping" is now frequently glorified in certain subcultures through music and other media. The culture of pimping has become so established that it has its own rules and "code of conduct." *Pipkins*, 378 F.3d at 1285. There are now books, videos, and songs that celebrate pimping, portray pimps as heroes, and provide "how to" advice to nascent pimps. Dumas is one of a growing number of men who see nothing wrong with pimping teenagers. There is a great need to deter young men who are contemplating becoming pimps or assisting pimps. There is a great need to send a message to would-be pimps that treating human beings as property is immoral, unlawful, and will be severely punished.

Furthermore, due to the immaturity of victims and their vulnerability to threats and coercion, it is often difficult to detect and punish sex trafficking crimes. As in this case, pimps are sometimes the first men to ever show an interest in their teenage victims, and the victims often mistake that attention for love. Some victims, therefore, remain staunchly loyal to their pimps, despite the beatings they repeatedly endure. Instead, they sometimes mistakenly perceive the beatings as a normal expression of a pimp's love for his "bitches." In addition, because many victims are runaways, they have an aversion to contacting or cooperating with the police. Thus, criminals preying upon such victims enjoy a high probability of success with little chance of detection. Only strong punishments for those who are caught and prosecuted will deter others from participating in such schemes.

Because the financial rewards of such crimes can be great, and the risk of being discovered and punished are easily minimized, in order to deter such crimes the sentences of those who are successfully prosecuted must be substantial. *See United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) (strong sentences are necessary to deter crimes that are potentially lucrative). Only a strong sentence will negate the incentive to commit such crimes and the danger that similar crimes will go undiscovered and unpunished. *See United States v. Newmann*, 965 F.2d 206, 210 (7th Cir. 1992) (deterrence requires stronger sentences when a crime is less likely to be detected because potential punishment is discounted by the improbability of its being imposed).

### E. The Kinds of Sentence Available

The kinds of sentences available also demonstrate the need for a sentence within the range suggested by the Guidelines. There is no other sentence that would adequately address the other Section 3553(a) factors.

14

## F. The Need to Avoid Unwarranted Sentencing Disparities

This Court must also fashion a sentence that avoids unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). In this case, the best way to avoid unwarranted sentencing disparities is to sentence Dumas within the range suggested by the Guidelines. By "devising a recommended sentencing range for every type of misconduct and every level of criminal history, the Guidelines as a whole embrace the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *United States v. Johnson*, 445 F.3d 339, 343 (4th Cir. 2006); *see United States v. Clark*, 434 F.3d 684, 687 (4th Cir. 2006) (noting that the Guidelines were designed to avoid "unwarranted disparities that existed in the federal criminal justice system"). Indeed, the Sentencing Commission is required by law to create and maintain the Guidelines so that they do not produce disparate sentences. *See* 28 U.S.C. § 991(b)(1)(B) (requiring the Sentencing Commission to avoid "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); *Gall*, 552 U.S. at 54 ("avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges").

In addition, it is worth noting that in similar cases featuring conduct comparable to Dumas's conduct, other Courts have imposed sentences greater than 360 months of imprisonment:

*United States v. Campbell*, No. 4:12-CR-40039 (D. S.D. May 30, 2013) (three life sentences for prostituting one adult and two minor victims);

*United States v. Rodriguez*, No. 8:12-CR-136 (M.D. Fla. Mar. 22, 2013) (life sentence for trafficking a single 15-year-old minor);

*United States v. Campbell*, No. 1:10-CR-26-1 (N.D. Ill. Nov. 26, 2012) (life sentence for sex trafficking four adults);

15

*United States v. Mustafa*, No. 1:11-CR-234 (N.D. Ga. Sept. 20, 2012) (life sentence for sex trafficking of multiple women);

*United States v. Juarez-Santamaria*, No. 1:11-CR-217-LO (E.D. Va. Oct. 28, 2011) (life sentence for a defendant who prostituted a single twelve-year-old girl);

*United States v. Kemache-Webster*, No. 8:10-CR-654 (D. Md. Aug. 5, 2011) (defendant who enticed a minor to engage in criminal sexual activity was sentenced to imprisonment for life);

*United States v. Thompson*, No. 4:09-CR-40129 (D. S.D. April 15, 2011) (defendant who pleaded guilty to sex trafficking a minor sentenced to imprisonment for life);

*United States v. Gordon*, No. 3:10-CR-130 (M.D. Fla. Jan. 10, 2011) (defendant sentenced to life imprisonment for sex trafficking a single 15-year-old girl whom the defendant physically restrained);

*United States v. Cephus*, No. 2:09-CR-43 (N.D. Ind. Dec. 6, 2010) (defendant, who operated a prostitution business, was convicted of sex trafficking of multiple minors and sentenced to life imprisonment); and

*United States v. Stewart*, No. 2:09-CR-43 (N.D. Ind. 2010) (life imprisonment for sex trafficking of a minor by a prostitution business run by a co-conspirator).

Dumas's attorney presumably will point out that Dumas's co-conspirators received sentences less than 360 months in length. Specifically, Edwin Barcus was sentenced by this Court to 300 months of imprisonment. *United States v. Edwin Barcus*, 1:13-CR-95 (E.D. Va. June 7, 2013). Joshua Dumas was sentenced to 239 months of imprisonment. *United States v. Joshua Dumas*, 1:13-CR-94 (E.D. Va. June 7, 2013). But sentencing Dumas to 360 months of imprisonment would not create an unwarranted sentencing disparity with his co-conspirators. Sentencing disparities that are based on legitimate distinctions between co-conspirators are not

16

unreasonable. *United States v. Moore*, 581 F.3d 681, 683 (8th Cir. 2009). Here there are important distinctions between Barcus/Joshua Dumas and Quintavis Dumas. Defendants like Dumas, who deny their guilt and elect to be tried for their crimes, are not similarly situated to defendants who admit guilt, plead guilty, and accept responsibility. It goes without saying that "defendants who plead guilty often get much lower sentences." *United States v. Navedo-Concepcion*, 450 F.3d 54, 60 (1st Cir. 2006); *accord United States v. Haynes*, 582 F.3d 686, 704-05 (7th Cir. 2009). Defendants who do not plead guilty and do not admit their guilt frequently face stiffer sentences than their counterparts who concede guilt, and the resulting differences in their sentences are reasonable. *United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006); *see also United States v. Statham*, 581 F.3d 548, 556 (7th Cir. 2009) (explaining that different members of the conspiracy are not similarly situated where some enter plea agreements, cooperate in the investigation, and have less extensive criminal histories, and there is thus nothing unreasonable about the fact that the sentences they received were also different). As a result of Dumas's decision not to plead guilty and accept responsibility, Dumas did not receive a three-level reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. His sentence, therefore, should be greater than that imposed on co-conspirators who pleaded guilty and expressed remorse for their conduct.

It is also worth noting the timing of events, insofar as Barcus and Joshua Dumas pleaded guilty early, before the government knew the full extent of the conspiracy. As the Eighth Circuit has noted: "There will be many cases where a defendant receives a higher Guidelines range when he or she pleads or is tried later in the conspiracy, after the government has more fully developed its case." *United States v. Krutsinger*, 449 F.3d 827, 830 (8th Cir. 2006); *see United States v. Ortiz-Torres*, 449 F.3d 61, 84 (1st Cir. 2006) (explaining that one co-defendant

17

received a lower sentence than another because he "entered into a plea agreement much earlier in the prosecution").

Furthermore—in contrast with the defendant—Barcus and Joshua Dumas offered to cooperate in the investigation and prosecution of others. As another Court of Appeals has held, "defendants who confess guilt, plead guilty, and cooperate with an investigation simply are not similarly situated to those who force the government to prepare for and go to trial. In other words, a sentencing difference is 'not a forbidden "disparity" if it is justified by legitimate considerations, such as rewards for cooperation.'" *United States v. Stevenson*, 680 F.3d 854, 858 (7th Cir. 2012) (quoting *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006)); *see Docampo*, 573 F.3d at 1101-02 (a defendant who proceeded to trial is not similarly situated to co-conspirators who cooperated with the government). "There is no unwarranted disparity even when the sentence the cooperating defendant receives is *substantially* shorter." *Docampo*, 573 F.3d at 1101; *United States v. Cain*, 487 F.3d 1108, 1115 (8th Cir. 2007) (the defendant was not similarly situated to his co-defendants because they pleaded guilty and cooperated with the government).

Accordingly, a sentence within the Guideline range would help avoid unwarranted sentencing disparities and would be in accordance with all of the factors set forth in Section 3553(a).

**G.     The Need to Provide Restitution to Victims of the Offense**

The government has submitted a proposed restitution order. Although nothing can return the victims to the status quo ante, the payment of restitution according to the terms of the proposed order will aid one of the victims in her attempt to put this ordeal behind her.

**IV.     Conclusion**

In closing, the United States respectfully requests a sentencing of 360 months of imprisonment, which is the lowest sentence suggested by the Sentencing Guidelines.  The defendant's criminal conduct warrants such punishment.  The government does not request a fine, but will ask this Court to enter a Restitution Order in the amount of $17,572.47.

Respectfully Submitted,

Dana J. Boente
Acting United States Attorney


By:          /s/
Michael J. Frank
Assistant United States Attorney
C. Alexandria Bogle
Special Assistant United States Attorney (LT)
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 26, 2013, I will electronically file the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send an electronic copy to: James W. Hundley, counsel for the defendant.

By:          /s/
       C. Alexandria Bogle
       Special Assistant United States Attorney